Clarence A. Wood, Appellee, v. Prudential Insurance Company of America, Appellant.

Gen. No. 8,639.

Opinion filed May 18, 1933.

STONE & TAYLOR, for appellant.

BUSCH & HARRINGTON, for appellee; EARL C. HARRINGTON and C. E. TATE, of counsel.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an action of assumpsit upon an insurance policy commenced by summons issued on April 9, 1931. It grows out of the failure of appellant, The Prudential Insurance Company of America, to pay to the appellee certain instalments which he claims are due him under the provisions of a life insurance policy which had been issued to the plaintiff by the defendant on December 5, 1918. This policy of life insurance contains what is commonly designated as a "permanent disability clause."

The plaintiff's declaration consists of a special count upon the policy and the consolidated common counts. In the special count the plaintiff alleges the making of the policy and sets forth the policy of insurance *in toto,* including the plaintiff's application for the

same. The plaintiff, after setting up the policy of insurance in the special count, avers:

(1) That he became totally and permanently disabled after the payment of the first premium on the policy to such an extent that by reason of such disability or incapacity he was rendered wholly and permanently unable to engage in any occupation or to perform any work for any kind of compensation or financial value; and

(2) That more than six months prior to the institution of this suit he had furnished "due proof" to the defendant of the alleged permanent disability or incapacity to engage in any occupation or perform any work for any kind of compensation or financial value.

The contract provided that in event of the death of the insured the beneficiary named shall receive 120 payments of $50, the first payment to be made immediately upon receipt of due proof of the death of the insured.

The policy also provides for a "commuted" value of the instalments payable thereunder, this value being designated in the policy as $5,135. The policy recites that it was issued in consideration of an annual premium of $142.70 to be paid by the insured on or before the 5th day of December of each year during the continuation of the policy and recites that the total disability privileges are granted to the insured without any additional cost. The policy also contains the customary and usual provisions relating to dividends, incontestability, loan and cash surrender values, extended insurance, etc. Attached to the policy and made a part thereof is a photostatic copy of the application of the plaintiff for said policy and declarations made by the plaintiff to the medical examiners as a part of the application. The application was filed by the plaintiff and dated November 26, 1918. Contained in

this policy are provisions commonly designated and known as "a total and permanent disability clause," which are as follows:

"If the insured, after the first premium on this policy has been paid, shall furnish due proof to the company, while this policy is in full force and effect and while there is no default in the payment of premium, that he, at any time after payment of such first premium, from any cause whatsoever shall have become permanently disabled or physically or mentally incapacitated to such an extent that he by reason of such disability or incapacity is rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value, the company upon receipt of such proof will waive the payment of each premium that may become payable thereafter under this policy during such disability.

"If such disability shall occur before the insured is 60 years of age the company will, in addition to such waiver, during such disability, pay to the insured the commuted value specified on the first page of this policy, less any indebtedness, in one hundred and twenty monthly installments during ten years, each installment of the amount of $9.74 per $1,000 of commuted value payable; the first installment to become payable six months after the company shall have received such proof and subsequent installments monthly thereafter."

To this declaration the defendant filed a plea of general issue. Issue was joined thereon by the plaintiff and the cause was heard before a jury. The jury returned a verdict for the plaintiff for $1,559.96, and as a part of their verdict answered certain interrogatories or special findings submitted to them at the request of the defendant. A motion by the defendant to set aside the verdict and for a new trial was overruled

and the court entered a judgment on the verdict for $1,022.79 and costs of suit, the court having first requested of and received from the plaintiff a remittitur to the above amount. From this judgment the defendant has brought the record to this court by appeal for review.

For brevity we shall designate appellee as plaintiff and appellant as defendant.

The defendant contends that there was an utter lack of due proof submitted by plaintiff of his disability, and that this being a question of law the trial court was in error in permitting the case to go to the jury or in permitting the jury to consider the sufficiency of the proof as a question of fact. To cover this phase of the case plaintiff submitted what is called in the record plaintiff's Exhibits 5 and 7. Exhibit 5 is a statement upon a blank, prepared and furnished by the defendant company, consisting of printed questions and blank spaces left for answers, made out by the plaintiff and submitted to the defendant February 27, 1929. The statement, among other things, gives the number of the policy, insured's full name and date of birth, his home address, and states that applicant was first affected by the present disability on September 15, 1927; that he was wholly incapable of engaging in any gainful work and had been continuously so disabled since the 15th to the 20th of September, 1928; that he was not continuously confined to the bed, but was at home all of the time; that applicant had done nothing for three years; that his last employer was the Longview Grocery Company at Longview, Illinois; that his average monthly earnings at the inception of the disability was one hundred dollars a month; that the names of three physicians given were those with whom he had consulted from September, 1927, to January, 1929; that this illness had continued for three years but was worse since September, 1927; that he had no other

insurance. The policy was taken in 1918 and the statement is signed by plaintiff, applicant, but is not verified, there being no form for a verification on the printed statement.

Another statement was submitted the same day by appellee upon a similar blank filled out by Dr. C. E. Johnson of Homer, Illinois, stating that he was first consulted by plaintiff on September 20, 1928, and that his last treatment was on January 19, 1929; that his diagnosis was pulmonary tuberculosis, aortic dilation (arch), and that the symptoms were objective, with X-ray pictures and subjective, on short breath and weakness; that the diagnosis had been confirmed by X-ray pictures of heart and lungs, showing aneurysmal enlargement of the arch of aorta and fibrous deposits in lung. Dr. Johnson stated that he believed the insured to be wholly incapable of engaging in any kind of gainful work and that he had been continuously disabled since September 20, 1927. He further stated that he had never previously treated the plaintiff; that plaintiff was first affected on April 1, 1927; that the history of the case indicated a previous illness of empyema; that Doctors J. M. Lawson and H. N. Greaves had also treated plaintiff in connection with this illness; that plaintiff was not continuously confined to his bed but was confined to his home almost all of this time; that plaintiff does not do anything and has not been able to work since September 27, 1927; that plaintiff had not been able to resume work and Dr. Johnson did not think he ever would be able to resume work; that plaintiff's condition had shown no improvement and the witness considered plaintiff so disabled that he would "for all time" be prevented from engaging in any gainful work, and that the doctor came to that conclusion on September 20, 1928.

The doctor described plaintiff's symptoms as "short of breath, subnormal temperature of mornings 99°—

100 evenings. ·Tubercular lungs." This statement was signed by Dr. C. E. Johnson and submitted to the defendant, but was not verified.

Some other statements were offered in evidence by plaintiffs, but were not admitted by the court as proper proofs of plaintiff's condition, as having been presented to the defendant more than six months prior to the commencement of the suit. These statements, recited herein, upon the trial were objected to by defendant as "incompetent, immaterial and irrelevant." They were not objected to because "not verified." Defendant never asked for verified statements and the printed forms containing questions and answers provided by defendant had no place or form for a verification. The objections as made, "incompetent, immaterial and irrelevant," did not raise the question of verification. Competent evidence is that "which, in respect to evidence, means the characteristic of being that which the very nature of the thing to be proved requires as the fit and appropriate proof in the particular case." 22 C. J. p. 192. The statements were not incompetent.

The rule in regard to relevancy ·and materiality is that "whenever the court feels that a fact is not of probative value commensurate with the time required for its use as evidence, either because too remote in time, or too uncertain or too conjectural in its nature, the fact may in the exercise of a sound discretion be rejected." The matter submitted was not immaterial or irrelevant. 22 C. J. p. 162.

Nothing in the contract required that "the proofs". to be submitted to defendant should be verified and defendant did not require such proofs. The insurance contract did not invest defendant with any judicial powers, and did not give the defendant the right to try the question whether or not plaintiff was permanently injured.

It is contended by defendant that under the clause in the policy in question the condition precedent, furnishing due proofs to the defendant more than six months prior to the commencement of suit that he, plaintiff, had become permanently disabled, etc., was a question of law, and that the court should have considered these proofs only and instructed the jury to find for the defendant. But in *Traiser v. Commercial Travelers Eastern Accident Ass'n,* 202 Mass. 292, 88 N. E. 901, submitted by defendant, the court held:

"This question, it must be remembered, is to be decided solely upon the evidence furnished to the directors. As was stated in *Noyes v. Eastern Accident Association,* 190 Mass. 171, 181, 76 N. E. 665, the issue upon this branch of the case is not what was actually the cause of the death, but whether the plaintiff had furnished sufficient proof to the directors. Without showing that she has done this, she cannot maintain the action. But with some hesitation we have reached the conclusion that the question whether she has maintained this burden is for the jury. It is clear from what has been already said that from the evidence stated, without considering the additional evidence put in at the trial, which of course cannot be considered upon this issue, the jury might find that the death was due wholly and solely to the accidental injuries. If the jury should so find, we are of opinion that they would have also the right to say that the same fair preponderance of the evidence which had convinced their judgments ought to have produced the same conviction in the minds of other reasonable men. It would be an anomaly for us to decide otherwise. It cannot be said as matter of law that reasonable men were bound to come to only one conclusion. *Webber v. Cambridgeport Savings Bank,* 186 Mass. 314, 315, 71 N. E. 567. It is not for the defendant, in a case of contradictory evidence, finally and decisively to

pass upon the rights of the insured, if such a condition as this has been reasonably complied with.''

Also, in *Policemen's Benevolent Ass'n v. Ryce*, 213 Ill. 9, 21, also cited by defendant, the court held: ''The question of whether or not there was satisfactory evidence of the death of the assured was a question to be determined by the jury in this suit, and not by the association.'' It was also held in said cause that ''where an accident policy required the beneficiary to furnish proof of loss satisfactory to the insurer's board of directors, the beneficiary was only required to furnish such proofs as ought to be satisfactory to reasonable men acting reasonably.''

In *Ginell v. Prudential Ins. Co.*, 200 N. Y. S. 261, the court did hold: ''Under the terms of the policy the premium is to be waived and the payment made, if due proof to the company of the total permanent disability be made. The payment is not dependent upon actual total permanent disability, but on proof of such. . . . The provisions that the benefits should be realized during the continuance of the total disability only does not indicate to me that the parties contemplated that the word 'permanent' was a synonym of 'temporary' in the light of the (to me) significant fact that the benefits are to be realized upon proof of total disability being furnished, rather than upon actual total disability.'' And in *Policemen's Benevolent Ass'n v. Ryce, supra,* the court held, as is true in all cases, that ''the legal effect of such proofs is a question of law for the court.''

We have examined the proofs in this case, the proofs offered as to ''the due proofs'' to the company more than six months prior to the commencement of the suit, as well as the entire record, and we cannot say, as a matter of law, but that the ''due proofs'' submitted upon the condition precedent were sufficient to convince reasonable men, acting reasonably, that plaintiff had become permanently disabled or physically in-

capacitated to such an extent that he, by reason of such disability or incapacity, was rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value. This specific question was passed upon by a special verdict of the jury, as well as the question by a special verdict as to whether the preliminary proof—"due proof"—had been furnished, and both special verdicts were in plaintiff's favor.

Plaintiff in 1894 had been operated on for empyema and was confined in bed or in the house about three months. Dr. J. M. Christie was a witness for plaintiff. He made a fluoroscopic X-ray examination of plaintiff's chest and testified:

"The results of the fluoroscopic observation on Mr. Wood's chest showed the left lung was scarred and collapsed, the diaphragm on that side was practically fixed, practically no excursion to it, not over a quarter of an inch excursion of the diaphragm; when he would take in a deep breath there was no lighting up of the chest from that side; the heart, instead of being mostly to the left side of his chest as it is under normal conditions, was displaced to the right side; the right lung was functioning, but there was a good deal of thickening of the tissues in the lower half of the lung; the diaphragm on that side had an excursion of about two inches; the aortic arch, the vessel that leaves the heart, was dilated, I would say, probably a fourth to a half larger than it is normally. There is no expansion on the left side of the chest or at least it is not noticeable. There was expansion on the right side of the chest, not a great lot, not a normal expansion of the chest. We measured his inspiration, which ordinarily from complete expiration to complete inspiration is about three and a half to four inches in a normal patient, was a half an inch in this patient. This decreases the amount of air that can be taken into the lungs. This fluoroscopic examination, I think, was made about a

month ago. On last April, when he first consulted us, we made a complete physical examination of the chest. The rapidity of his pulse has been tested; I don't know just that we did it that particular day. We took his pulse and his temperature was observed at that time, but it has been observed since then, too. There was no one else except myself present when this examination was performed. After I saw him in April the next time I saw him was about a month ago. At that time I made another complete physical examination of the chest. I would say the conditions at that time were practically the same as they were at the time of my examination in April.

"I saw him again about a week ago and an examination was conducted. No one was present either at the second or third examination besides myself. I didn't observe any change in his physical condition between the second and third examinations. I saw him again yesterday. Dr. Powell was present at that examination. At that time we repeated the fluoroscopic examination of his chest and also repeated the physical examination, and observations were taken of his pulse and respiration at rest and after exercise. We also measured the expansion of the chest. There was no difference in the results of the expansion of the chest than when I first measured him. Examination of the respiration showed a respiration of 45 to 50 on rest and after exercise it went up to about 70. The respiration of a normal person at rest is 16 or 18, possibly 20, and after exertion such as Mr. Wood made at that time it could go up to 30. Respiration means the number of times the patient breathes in a minute. We made an examination of his pulse rate at that time. His pulse at rest was 75; after exercise it was 115. The normal increase in rate in a normal person upon such exercise would probably be 90 to 100. His blood pressure at that time was about 130 over 70. So far as his

lungs were concerned, we made the same findings, same condition, that had previously existed. From the first time I examined him down to yesterday I did not observe any improvement in his condition. I have an opinion with reasonable certainty as to whether or not his condition will improve. I don't think his condition will improve. Regarding an opinion as to whether or not his condition will get worse, that would depend, I would say, somewhat on the care that he would take of himself.''

There was other testimony for plaintiff along the same line.

Dr. Gurnon testified for the defendant that ''as a result of the examination I found a condition where he had a chronic—well, construction of his chest on that side, which we call a chronic adhesive pleuritis, but, other than that, physical findings didn't indicate anything wrong with him. Based upon the physical evidences of my examination, I did not find anything that would interfere with his taking normal exercise. His temperature was 98.4; normal temperature is between 98 and 98.6 or .8 by mouth and a little over a half a degree higher by rectum. That was my first and only observation of him, and was in June, 1928; I don't know the exact date. After making this examination I made a report of my findings and sent them to the company. I have observed the plaintiff sitting in the court room here today. I do not see any change in his appearance from the time I first saw him. Defendant's Exhibit 2 is the report that I sent in to the insurance company.

''As I remember there were two scars on his left chest showing some sort of an operation or incision had been made there. His heart was somewhat displaced toward the right. I had an X-ray taken of him. I did not examine his chest and heart under a fluoroscope. A man might have normal reflexes so far as his

eyes were concerned and still be physically unable to work. At that time I made a count of his respiration and am sure that it was 20. I made a report of that to the company. I also took his pulse at that time. It was 72 to 80. I don't recall examining him after he had exerted himself. He had some prominence or bulging of the aortic arch at the left. That was determined by X-ray examination. The right lung in the X-ray showed clearer than the left.''

Dr. Gurnon further testified: ''I saw the plaintiff just one time on the 8th day of June, 1928. That was the day I made out this report. At that time I was of the opinion that the insured would not be able to take up any form of profitable employment unless it was absolutely necessary for him to do so in order to live. He told me at that time he was not able to engage in any kind of gainful work. He has a chronic restriction of the left chest and adhesive pleuritis.''

Dr. Walton testified: ''I told Mr. Wood if I were him I would get out, expand my chest, drink lots of fresh water, get lots of fresh air, eat lots of fruit and vegetables and take exercise as he could. Of course, he was probably in somewhat of a weakened condition. Anybody will get that way. I think that the condition I saw there would yield favorably to that kind of treatment.''

Dr. Greaves testified: ''I made an ordinary physical examination, that is, of the chest, lungs, heart and so on, and nervous system. I had examined him before for other things and I have examined him since. I examined him in May, 1929. That was made at the request of the Prudential Life Insurance Company. I made a report of that examination and sent it to them. I have not examined him at any time since then, but I have seen him frequently. I have seen him on the street in his car, I have seen him sitting, talking with friends, whittling wood, things of that kind. From

my acquaintance with him in my examinations of him in February, 1928, and May, 1929, and the times I have seen him and observed him down to the present time I have an opinion as to whether or not during all of that time, at any time at which I saw him, he was incapable of performing ordinary labor. My opinion is that Mr. Wood is not so situated, that is, I mean he was able to do some work.''

The testimony was conflicting, but the jury saw and heard the witnesses and the plaintiff and were better able to determine the credibility of the witnesses than this court is able to do.

Plaintiff contends that it is not necessary that he should be totally and permanently incapacitated for any purpose before he could recover on the contract in question. It is argued that because he could drive a car for a short distance and sit in a chair and whittle, did not negative his disability to follow a gainful occupation, citing *Missouri State Life Ins. Co. v. Copas,* 265 Ill. App. 478, with which authority this court is in agreement.

It is urged by plaintiff that pleading to the declaration on the merits by the general issue, without pleading to the preliminary due proof required by the contract, waives the making and sufficiency of such proof, citing *Williamsburg City Ins. Co. v. Cary,* 83 Ill. 453; *American Central Ins. Co. v. J. B. Henninger & Co.,* 87 Ill. App. 440; *Maltby v. The Empire Auto Ins. Ass'n,* 239 Ill. App. 532; *Aetna Ins. Co. v. Jacobson,* 105 Ill. App. 283; *U. S. Health & Acc. Ins. Co. v. Harvey,* 129 Ill. App. 104. We cannot agree with this contention. The general issue in this cause required plaintiff, appellee, to establish every fact requisite under the declaration to establish liability and make out a case.

Defendant complains that plaintiff's first instruction was error, in that it omits one of the vital issues

in the case as to whether plaintiff submitted due proofs of his disability more than six months prior to the commencement of the suit. Said instruction is as follows: "The Court instructs the jury that the question as to whether the plaintiff is totally and permanently disabled within the meaning of the terms of the policy of insurance is a question of fact for the jury, and if the jury believe from a preponderance of the evidence that the plaintiff from any cause whatsoever shall have become permanently disabled or physically incapacitated to such an extent that he, by reason of such disability or incapacity, is rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value, then and in such event of the proof the jury should find that the plaintiff is totally and permanently disabled within the meaning of the policy of insurance in question."

The summons in this cause was issued April 9, 1931, and there was submitted to the jury a special interrogatory as follows:

"Did the plaintiff at any time prior to the 9th day of October, A. D. 1930, furnish to the defendant due proof showing him to have become permanently disabled or physically or mentally incapacitated to such an extent that he, by reason of such disability or incapacity, was rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value? Answer the question yes or no." To which interrogatory the jury answered "Yes," and we cannot believe that the jury was misled by this instruction.

The further special interrogatory was submitted to the jury and answered in the affirmative:

"Had the plaintiff at any time prior to October 9, A. D. 1930, become permanently disabled or physically incapacitated to such an extent that by reason of such

disability or incapacity he was rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value? Answer the question yes or no.''

The jury saw the parties and heard the witnesses and we find no substantial error upon which to base a reversal of this cause.

Accordingly, the judgment of the circuit court of Champaign county is affirmed.

*Affirmed.*