Frank Victor, Appellee, v. The Prudential Insurance
Company of America, Appellant.

Gen. No. 38,323.

Opinion filed February 19, 1936.

HOYNE, O'CONNOR & RUBINKAM, of Chicago, for appellant; NATHANIEL RUBINKAM and WILLIAM S. ALLEN, of Chicago, of counsel.

MARTIN O. WEISBROD, HARRY J. BUSCH and SEYMOUR SCHEFFRES, all of Chicago, for appellee; MARTIN O. WEISBROD, of counsel.

MR. JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from a verdict and judgment of $314.33 recovered before a court and jury in favor of the plaintiff and against the defendant for disability payments under a life insurance policy issued by the defendant on the life of the plaintiff.

The defendant issued its life insurance policy on the life of the plaintiff in 1923. Shortly thereafter the plaintiff filed proof of his total and permanent disability and received payments of $10 a month, which

payments were made to him by the defendant for about eight years. The premiums due under the policy were also waived during that period in accordance with the terms of the policy. The last payment made to plaintiff by defendant was on or about July 1, 1932. The policy offered in evidence relating to total and permanent disability reads as follows:

"PROVISIONS AS TO TOTAL AND PERMANENT DISABILITY—WAIVER OF PREMIUMS—MONTHLY PAYMENTS TO THE INSURED.

"DISABILITY BEFORE AGE 60—WAIVER OF PREMIUMS.—If the Insured, after the first premium on this Policy has been paid, shall furnish due proof to the Company, while this Policy is in full force and effect and while there is no default in the payment of premium, that he, at any time after payment of such first premium, while less than sixty years of age, from any cause whatsoever shall have become permanently disabled or physically or mentally incapacitated to such an extent that he by reason of such disability or incapacity is rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value, the Company upon receipt of such proof will waive the payment of each premium that may become payable thereafter under this Policy during such disability. Without prejudice to any other cause of disability, the permanent loss of the sight of both eyes, or loss by severance of both hands above the wrists, or of both feet above the ankles, or of one hand and one foot, shall be considered disability or incapacity within the meaning of this provision.

"DISABILITY BEFORE AGE 60—MONTHLY INCOME TO THE INSURED.—If such disability shall occur before the Insured is sixty years of age and prior to the maturity

of the policy as an Endowment the Company will, in addition to such waiver, pay to the Insured monthly as specified on the first page hereof, the sum of $10 for each $1,000 of the Face Amount of Insurance under the Policy. The first monthly payment shall be made six months after the Company shall have received such proof and subsequent payments shall be made on the first day of each month thereafter during such disability. Interest due on any indebtedness under the Policy may be deducted from such monthly income payments.

"Such waiver of premiums and such monthly payment shall be additional to all other benefits and obligations under this Policy except as to Accidental Death Benefit and the Policy shall be continued in force and the Face Amount of Insurance, less any indebtedness, shall become due and payable at death or maturity in the same manner as if the Insured had actually continued to pay the premiums.

"DISABILITY AFTER AGE OF 60—WAIVER OF PREMIUMS WITH REDUCTION OF FACE AMOUNT OF INSURANCE.—If the disability of the Insured as defined above shall occur after the Insured is sixty years of age, the Company upon receipt of due proof of such disability will waive the payment of each premium that may become payable thereafter under this Policy during such disability, but the Face Amount of Insurance hereunder shall be reduced by the amount of each premium so waived, and any loan and non-forfeiture values shall thereafter be based upon the Face Amount of Insurance thus reduced.

"RECOVERY FROM DISABILITY.—The Insured, upon demand by the Company at any time during such disability and before the Company's liability hereunder has ceased, shall furnish due proof that he actually continues in a state of disability, as defined above, and in case of his failure so to do the Insured shall be

deemed to have recovered from such state of disability.

"In the event that the Insured recovers from such state of disability no further premiums shall be waived and no further monthly payments shall be made, and any insurance under the Policy, exclusive of the Accidental Death Benefit, at the time of such recovery shall be continued in force subject to the payment by the Insured of any premiums falling due thereafter.

"EXTRA PREMIUM FOR TOTAL AND PERMANENT DISABILITY BENEFITS.—The Total and Permanent Disability Benefits are granted in consideration of the payment of an extra—annual premium of $0.70, which is included in the amount of the premium stated on the first page hereof and which is payable at the same time and subject to the same provisions as to payment as the regular premium under this Policy, provided, however, that in no event shall said extra premium be payable on or after the anniversary of the Policy next succeeding the date when the Insured attains sixty years of age."

The only question involved in the trial was whether or not the plaintiff was totally and permanently disabled in accordance with the terms of the policy.

The plaintiff offered in evidence the testimony of Dr. Lorance showing that in 1928, he was called upon to examine and treat the plaintiff; that he was the insurance representative of the defendant; that he examined the plaintiff and found that he had a temperature of 99½ degrees and his pulse was 120; that plaintiff was in bed and was suffering from incipient tuberculosis; that plaintiff had a rapid heart. The doctor testified further he first saw the patient on March 2, 1928, and that he saw him about two other times in 1928 and that in the year 1929 he saw plaintiff about once every month; that he had a rapid pulse of 120 and a temperature of 99½ and he had a cough and

had lost weight; that he heard chronic rales; that he took an X-ray picture of plaintiff's chest, but that he has not been able to find the picture; that in 1930 he made a stethoscopic examination at which time he could hear no rales, but that his pulse was very rapid; that he made another examination in 1932 and got a history from him as to his condition within a month previous to the examination; that he took X-ray pictures on June 15, 1932; that the X-ray showed a calcified nodule in the left chest about the size of a pea; that plaintiff had thickened bronchial tubes which indicates chronic bronchitis; increased hilum shadows, which indicates infection; that he examined plaintiff further on January 25, 1935, and found a pulse rate of 96 per minute; that the chest was healed and that plaintiff had no temperature; that he found a tricuspid murmur in the same place he found the murmur in June, 1932, and also found evidence of endocarditis and myocarditis; that he advised plaintiff that when his pulse rate was above 90 he should return to bed; that he saw no evidence of exertion when he walked to his office from the vehicle in which he was driven to the door; that the heart rate was 120 and that plaintiff had heart murmurs; that the infection in the lung did not cause the heart condition; that he had had a very badly infected throat from tonsillar abscesses; that plaintiff had incipient pulmonary tuberculosis; that plaintiff also had a mental condition that accompanied the other diseases; that he had paranoias ideas of persecution, which condition was evidenced by his slugging and hitting his father and he was sent to the Psychopathic Hospital; that there were times when he appeared to be mentally normal; that at times his reactions to questions were those of an acute mental aspect and at other times they were very sluggish, slow cerebration, his ideas were not brought out clearly and he put on all the appearances and symp-

toms of a neurosthenia; that in his opinion the man was not able to resume his work.

Several other witnesses testified that he had been sick and referred to his different ailments such as having a bleeding mouth and nose; that he had lost weight having weighed 160 pounds and that he now weighs 125; that he could not work as any exertion caused him to turn pale, become short of breath and made it necessary for him to quit work; that after working about five minutes he had to sit down; that his breath was short and fast.

The evidence shows that when plaintiff took out the policy of insurance with the defendant company he was working and that he was taken sick in 1924. The evidence also shows that he was treated for tuberculosis in 1932.

Plaintiff testified that before he took sick he did factory work, loading trucks and was stock clerk and that since then he has not been able to work; that he attempted to take a position loading stale bread but that after working three hours he had to go home and go to bed; that he was in bed in the winters of 1930, 1931, 1932 and 1933.

Dr. Soukup was sent by the defendant to examine plaintiff in August, 1932, February, 1933, and August, 1933. He made out a formal report showing that the plaintiff had dementia praecox, arrested pulmonary tuberculosis, a sallow and undernourished appearance and that his hands were cyanotic, which shows a deficient circulation; that some dry rales and a heart murmur systolic in time, were present and plaintiff also complained of epigastric pain in his abdomen; that plaintiff's pupils reacted sluggishly; that he, the doctor, does not know how far deterioration will take place; that if deterioration is progresisve he will be permanently and totally disabled; that he is unable to state whether recovery will take place. The doctor

further states that plaintiff cannot work; that he cannot work because he gets tired; that he certainly would not hire plaintiff to work for him and that he is totally disabled at the present time; that plaintiff shows some evidence of catatonism.

Dr. Soukup later testified for the defense stating that plaintiff could engage in gainful occupation. After making an examination of the plaintiff at the behest of the defendant for his mental condition, he reported that he found no mental deficiency. He did not examine plaintiff as to his heart or lungs or otherwise physically. He expressed an opinion that plaintiff could do gainful labor.

One or two other doctors made reports of different examinations which were quite contrary to their testimony in court.

One of the advantages of the jury system in this State is their ability to listen to the conflicting statements of witnesses and find out wherein the truth lies.

The controlling question here is whether or not the disability of the plaintiff entitled him to recover under the terms of the policy. This man was a laborer who relied upon physical exertion to earn a living.

In the case of *Grand Lodge Brotherhood of Locomotive Firemen v. Orrell,* 206 Ill. 208, manual labor was described as follows:

"Total inability to perform manual labor to an extent necessary to entitle him to receive earnings is what is meant. One who has power to use his hand or hands at labor for a brief effort only, and who is lacking in power to sustain the effort for a sufficient length of time to make the result thereof of any benefit to him in the way of assisting to his support, is for all practical purposes and in every actual sense totally incapacitated from performing manual labor."

In *Johnson v. Mutual Trust Life Ins. Co.,* 269 Ill. App. 471, which was a case involving a policy similar to the one in this case, the court said:

"These provisions clearly demonstrate that the contention now made by the complainant is not in harmony with nor contemplated by the provisions of the contract. It clearly indicates that the parties intended by this contract that whenever it should appear that the plaintiff was totally disabled and that such disability would, so far as it was possible to ascertain at the time, be permanent, the insured should receive the income and have the premiums waived as provided in his policy, from the time such fact is determined until the insured recovered or died."

It is claimed by the defendant that there was no proof of a total and permanent disability and that it is a condition precedent to the payment due under the policy and, in the absence of such proof, the plaintiff is not entitled to recover the payments thereunder, and also that the verdict and judgment are contrary to the manifest weight of the evidence.

The evidence here shows that the plaintiff had incipient tuberculosis, heart disease, bronchitis, dementia praecox, deficient circulation, a deficient nervous condition and several other diseases too numerous to mention. Defendant's doctor examined plaintiff at one time and reported his condition as permanent disability and afterwards testified differently. Whether or not these diseases were such as to create permanent disability, no one can tell. Everything human in this world is but temporary and we do not think it has yet been vouchsafed to mortal man to know for a certainty what the future holds, be he doctor, or layman. Suffice it to say there is sufficient evidence in the record to justify the jury in arriving at their verdict.

We do not think the rulings of the trial court were harmful to the defendant or the instructions to the jury prejudicial.

It is conceded by the plaintiff that an error was made in figuring the amount due to be $314.33, and that the amount should be $300 and the plaintiff offers to

remit the amount so as to make the total $300. A remittitur order for $14.33 is hereby entered against plaintiff, leaving a balance due plaintiff of $300.

For the reasons herein given the judgment of the municipal court is affirmed with remittitur.

*Judgment affirmed with remittitur.*

HALL, P. J., and HEBEL, J., concur.