George E. Lincoln, Plaintiff-Appellee, v. The Prudential Insurance Company of America, Defendant-Appellant.

Gen. No. 9,809.

Opinion filed February 20, 1952. Released for publication March 17, 1952.

SCHMIEDESKAMP & JENKINS, of Quincy, and ROSCOE HERGET, of Peoria, for appellant.

PENICK & PENICK, of Quincy, for appellee.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

This case presents an appeal by the Prudential Insurance Company of America, defendant-appellant, from a judgment entered upon a jury verdict against it plus interest, in the sum of $13,497.97, in favor of the plaintiff-appellee, George E. Lincoln. Lincoln, who

will be referred to as plaintiff in this opinion, sued Prudential, which will be termed defendant or Prudential in this opinion, to recover total and permanent disability benefits provided for in the Prudential policy issued to him. A trial was had, and the above verdict and judgment were entered. The court overruled defendant's motion for judgment notwithstanding the verdict and for a new trial and defendant now appeals.

The complaint alleged and the answer admitted that in 1921 the defendant delivered to the plaintiff its policy Number 3,724,000 which provided total and permanent disability benefits in the sum of $100 for each month of such disability. It further appears that in 1935 the plaintiff, who had been in the grocery business in Quincy most of his life, was stricken with asthmatic bronchitis and other pulmonary disorders. He sold a store then operated by him and went to Arizona for his health. Defendant actually paid the monthly benefits under the policy from October 1935 until January of 1942, in the total amount of $8,000. On or about the latter date defendant ceased the payments to plaintiff. The claim embodied in this lawsuit is for payments allegedly due after January 1942.

Defendant's defense to the alleged liability on the policy is that from 1942 to 1945 plaintiff was recovered from his disability, and that, having attained 60 years of age in 1940, plaintiff is not entitled to any new claim under the terms of the policy after that date.

Defendant first contends that the trial court erred in refusing to direct a verdict in defendant's behalf and in refusing to allow defendant's motion for judgment notwithstanding the verdict. We shall consider these points together since, by virtue of Supreme Court Rule 22, the power of the court to enter such a judgment may be exercised in all cases where, under the evidence in the case, it would have been the duty of the court to direct a verdict without submitting the cause to the jury. Chapter 110, sec. 259.22, Ill. Rev.

Stat. 1951 [Jones Ill. Stats. Ann. 105.22]. The motion for a directed verdict and the motion for judgment notwithstanding the verdict presented only a question of law, as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its most favorable aspect to the plaintiff, Lincoln, there was a total failure to sustain his cause of action. *Merlo v. Public Service Co. of Northern Illinois,* 381 Ill. 300; *Froehler v. North American Life Ins. Co. of Chicago,* 374 Ill. 17. On such motions the court may not weigh the evidence as is its duty on a motion for new trial, *Hughes v. Bandy,* 336 Ill. App. 472, aff'd 404 Ill. 74; but is limited to the sole duty of determining whether there is any evidence to support the verdict and judgment.

██ This being a suit upon a contract of insurance, the evidence must be viewed in light of the pertinent terms of the policy itself. Those provisions, in part, provided as follows:

"TOTAL AND PERMANENT DISABILITY BENEFITS.

Monthly Income . . . One Hundred . . . Dollars per month, payable at the Home Office of the Company to the Insured in event of total and permanent disability before age 60, subject to the provisions as to Total and Permanent Disability contained in the Policy."

"PROVISIONS AS TO TOTAL AND PERMANENT DISABILITY—WAIVER OF PREMIUMS—MONTHLY PAYMENTS TO THE INSURED.

Disability before Age 60—Waiver of Premiums—If the Insured, after the first premium on this Policy has been paid, shall furnish due proof to the Company, while this Policy is in full force and effect and while there is no default in the payment of premium, that he, at any time after payment of such first premium, while less than sixty years of age, *from any cause what-*

*soever shall have become permanently disabled or physically or mentally incapacitated to such an extent that he by reason of such disability or incapacity is rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value,* the Company upon receipt of such proof will waive the payment of such premium that may become payable thereafter under this Policy during such disability. Without prejudice to any other cause of disability, the permanent loss of the sight of both eyes, or loss by severance of both hands above the wrists, or of both feet above the ankles, or of one hand and one foot, shall be considered disability or incapacity within the meaning of this provision.''

''Disability Before Age 60—Monthly Income to the Insured.—If such disability shall occur before the Insured is sixty years of age the Company will, in addition to such waiver, pay to the Insured the Monthly Income specified on the first page hereof under the heading 'Total and Permanent Disability Benefits.' . . .

''In the event that the Insured recovers from such state of disability no further premium shall be waived and no further monthly payments on account of disability shall be made, and any insurance under the Policy, exclusive of the Accidental Death Benefit, at the time of such recovery shall be continued in force subject to the payment by the Insured of any premiums falling due thereafter.'' (Italics supplied.)

With regard to the medical testimony, plaintiff first contends that the evidence of both doctors called by him as witnesses is that plaintiff had the pulmonary afflictions mentioned above. In this contention plaintiff is correct. Plaintiff further insists that the two doctors testified that during the period in question (1942–45) plaintiff was unable to work and is unable to work

at the present time. Dr. Griep, for the plaintiff, testified that he saw plaintiff in July of 1941 and did not see him from that date until February of 1947, from which date he saw plaintiff at varying intervals until the time of the trial. The record shows no opinion by Dr. Griep on plaintiff's condition during the period here in controversy. It was Dr. Griep's opinion that the plaintiff Lincoln "*is* incapacitated for any useful or continuous work." (Italics supplied.) Dr. Ralph McReynolds, who did see plaintiff professionally during 1942, 1943, 1944 and 1945, testified that he had treated the plaintiff since 1931, that he advised the plaintiff to get out of the store, but that he did not know anything about the date on which that advice was given. When asked if he had an opinion as to whether during the years 1942 to 1945 Lincoln was physically capable of performing any useful or continued work, Dr. McReynolds stated "I can't answer the question yes or no . . . I thought that working was to his disadvantage, that he wasn't able to work, and I repeatedly told him so . . . "

It thus will be noted that Dr. Griep had no opinion whatsoever on the period in question, nor was there any connecting up of the present period with the time in question.

Dr. McReynolds merely testified that he had told the plaintiff that he was not able to work, which testimony falls far short of testimony that during 1942–1945, in the Doctor's expert opinion, plaintiff was not able to work. We conclude that there was no medical testimony that plaintiff during the period in question was wholly disabled within the terms of the above policy.

The evidence is undisputed concerning plaintiff's activities from January of 1942 until 1945.

Plaintiff, about January 1, 1942, left the home maintained by himself and his wife at Quincy, Illinois, and separated from his wife and went to a hotel and stayed.

At that time he was dressed in ordinary clothes, looked after himself, lived in the hotel, had a driver's license, drove his car, took a trip to St. Louis, and ate in restaurants. He remained separated from his wife for a number of weeks, and in April 1942, he purchased a stock of goods from the operator of his old grocery store, invoiced that stock of goods, opened up a bank account in the State Street Bank and Trust Company, borrowed $800 from the Bank, so that he could go into business, and opened up the George E. Lincoln Grocery Store at 30th and State Streets. It was a large one-room store with sheds on the side and with an apartment on the second floor. He and his wife, who had become reconciled, moved into that apartment, slept on the second floor, the cooking was done on the first floor, and plaintiff went up and down the stairs daily. During all of the time from April 1942 to March 1, 1945, while he was in the store he was dressed in ordinary clothes. He dressed himself, fed himself and looked after himself. He had a driver's license and drove his car on business errands. He and his wife went fishing; he went to church and visited with his relatives and their families.

He opened the store in his own name, and had similar listings in the telephone directory, the city directory, for sales tax application, and bank account.

Plaintiff testified that during that period of approximately three years he managed the store. It was his business. He answered the telephone, ordered all of the merchandise for his business, kept the books and records of the business, made out the bank deposits, took deposits to the bank, wrote the checks on the bank account, gave information to his income tax man so that his tax returns could be made out and showed an increasing, though very small, net profit in each of the years in which he was in business. He testified that he was improving the business and that business was getting better each year under his management.

Plaintiff further testified that he was in the store every day an average from four to seven hours per day, six days a week, except that maybe a dozen days during the three-year period he was not in the store. There is no testimony in the record that even on these days he was absent because of illness, but for the purposes of this motion we must so assume that fact as an inference favorable to the plaintiff. He was not hospitalized during that three-year period.

It is clear from the evidence that he had a desk in the store and a regular chair; that there were counters in the store and a cash register; that he moved about the store. He waited on customers, sold them cigarettes, bread, candy, canned goods and a general line of groceries, including feed. He apparently operated his store in the nature of a cash and carry business, as one of his witnesses testified that it was a custom in his trade for customers to load their own feed and to a considerable extent to pick up their own groceries. The store was operated by plaintiff and his wife and occasionally his daughter and an aged volunteer, who spent some of his time around the store without compensation. Plaintiff stated that he could not lift anything heavy; that he did not unload the groceries which were carried from the cash and carry store; that he did not lift the heavy cartons; and that he was not able to do what he would call work. Every witness who testified as a former customer said that plaintiff could not do substantial physical work of any continuous kind, and no witness testified to ever having seen him do any such work. There is no dispute that the plaintiff was suffering from asthma; that he occasionally had coughing spells, and that he was often uncomfortable; that he took hypodermics to relieve his asthma.

It is true that the state of affairs between 1942 and 1945 was in marked contrast to that existing from 1911,

when plaintiff opened his store, to 1935, when plaintiff first became disabled. He averaged about 12 hours a day in the store. During this active quarter-century he did nearly all of the physical labor at the store himself, and did all of the physical lifting; for example, hundred-pound sacks of feed, crates of chickens, oil barrels, as high as thirty or forty cases per week of graded eggs, and lifting calves up on scales, holding and weighing them, all in addition to the routine grocery tasks.

In summary, the question before the court as to the correctness of the lower court's ruling, is whether the most favorable evidence of plaintiff's physical affliction, together with the most favorable evidence of his inability to perform substantial physical work of any kind is some or any evidence that he was "permanently disabled or physically or mentally incapacitated to such an extent that he by reason of such disability or incapacity was rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value," within the terms of the policy provision above set forth and italicized.

The decided cases in Illinois on what constitutes total or whole and permanent disability afford a framework in which to consider the evidence. Many cases are cited by both parties which the court has read and carefully considered. We distinguish initially between "total disability policies" which provide for indemnities if the insured is disabled or prevented from engaging in any occupation and from performing any work for compensation or profit, and policies providing for benefits if the insured is disabled from transacting duties pertaining to the particular occupation in which the insured was then engaged, commonly called "occupational disability policies." It is apparent from a careful reading of the policy here involved that it was of the "total disability" type.

■■ As the cases below cited hold, in Illinois it appears that under a total disability policy "total permanent disability" means just that; that it does not mean disability from performing the insured's customary occupation, nor does it involve inability to perform part of one's work, the remainder being performed by others; and that to entitle an insured plaintiff to take his case to the jury under such a policy provision, there must be some evidence of total inability to work, subject to well reasoned practical exceptions by this court allowing merely supervisory work to be done, and allowing one working solely as a manual laborer and able to do only that type of work, to prove his inability to so labor as some evidence of his inability to do any gainful work.

In *Buffo v. Metropolitan Life Ins. Co.*, 277 Ill. App. 366, the insured was a wholesale and retail green grocer. His right hand and forearm were injured, and infection and stiffness resulted. The insured confined his proof to demonstrating that he was unable to perform the duties incident and necessary to the business in which he was then engaged. There was no attempt to show any inability to engage in any other occupation or to perform any other work for compensation or profit. The court reversed a judgment for the plaintiff under this state of facts.

Under a similar policy, the court reversed a decision for the plaintiff in *Aronson v. Mutual Life Ins. Co. of New York*, 313 Ill. App. 35, and held that the trial court should have directed a verdict for the defendant insurer. There the plaintiff insured suffered from acute arthritis. The evidence was that plaintiff could work for an hour or so but no longer, and medical testimony that the plaintiff was unable to work for five or six hours a day because of his disability, and that while plaintiff was unable to do physical work, he could do clerical labor. The other testimony was that the plain-

tiff owned a half interest in an apartment hotel, for which hotel he collected rents, ordered supplies, accepted deliveries, supervised repairs and decorations, and did minor repairs and decorating jobs himself. The court concluded in that case that:

"He is not a man whose livelihood is lost by mere inability to perform manual labor. He possesses business and managerial experience. Mere inability to work with his hands could not, we think, be held to amount to total disability within the meaning of this policy. There has been no proof that his bodily infirmity is such as to entirely prevent him laboring with his hands, but even if there was such proof, this would be far from showing that he was unable to work at any gainful occupation. This it seems on principle ought to be the test. . . . Without a distortion of the language used in the policy it cannot be said that he is totally and permanently disabled by bodily injury or disease. The language of this disability clause is interesting and significant in the light of the facts here disclosed. The disability insured against is as to its cause such as may arise either from bodily injury or bodily disease. The insured must be disabled 'totally and permanently,' must be continuously and wholly prevented *thereby* from performing any work either for compensation, for gain or for profit, and from following any gainful occupation. Plaintiff appears from the evidence to be the successful manager of an apartment hotel of which he is part owner and which the evidence indicates is operated for profit. If words can be made to express ideas with any certainty it would appear this plaintiff is not 'disabled' within the meaning of the disability clause of this policy."

In the cases cited by the plaintiff there was either no dispute about the existence of total disability during the period in question, *Greenberg v. Metropolitan Life Ins. Co.*, 379 Ill. 421, 428, or there was a conflict in the

evidence as to whether the plaintiff insureds in the respective cases were totally and permanently disabled that entitled the jury to pass upon that issue. Thus in *Victor v. Prudential Ins. Co. of America,* 284 Ill. App. 90, the insured was stricken with pulmonary disorders to such an extent that he spent four winters in bed, and did not work at any occupation from the inception of his illness, except for one occasion when he attempted to work and after three hours on the job was forced to come home and take to his bed. The medical testimony was positive and in conflict as to the presence of total disability. In *Wood v. Prudential Ins. Co. of America,* 271 Ill. App. 103, in addition to positive medical testimony that the plaintiff by reason of his diseases was unable to engage in any gainful work, there was evidence that the plaintiff had not worked and had been confined to his home for a long period and that the only activities engaged in by him were driving a car and whittling. To the same general effect are the remaining cases cited by the plaintiff, for in all there was a conflict of evidence which made the question one for the jury, and in none of these cases was actual work done by the insured. *Davis v. Midland Casualty Co.,* 190 Ill. App. 338; *Touloupas v. Equitable Life Assurance Society,* 286 Ill. App. 136; *Missouri State Life Ins. Co. v. Copas,* 265 Ill. App. 478.

██ Viewing the evidence most favorable to the plaintiff, with all the inferences that can reasonably be drawn therefrom we hold as a matter of law that there was a total failure to sustain plaintiff's cause of action. His inability to do heavy work, or as plaintiff terms it ''substantial work of a continuous kind,'' itself indicates no more than a partial disability and is no evidence of total disability under the authority of the *Aronson* case, *supra.* His work prior to his illness in 1935 consisted of heavy labor, light tasks, and the managerial and clerical aspects incident to the grocery

business. If he had been able to perform the heavy labor but not the light tasks or the clerical duties incident to the business it could not be seriously contended that his disability was whole and with respect to the evidence before us, we see no reason why a different result should be reached here. Plaintiff's activities were not restricted to supervision, nor is there any evidence that his livelihood was made and could be made solely by manual labor, hence the facts of this case are clearly distinguishable from the facts before this court in the *Davis* and *Copas* cases, *supra*.

It is unquestioned that plaintiff during this period was ill. But his almost constant discomfort, and the frequent injections taken by him, together with the few days he was absent from work, which we will assume were due to his afflictions, and his one severe attack, are at most, evidence of only partial disability, and not of any whole permanent inability to work which is required by a policy of this type, as construed by the courts of this State.

The fact that the financial returns from his enterprise were pitifully small or under proper accounting practices nonexistent, is of no consequence for the policy reads "perform any work for *any kind* of compensation of financial value." The purpose for which the plaintiff operated his store was for financial gain. It is undisputed that plaintiff received his subsistence and small net profits therefrom. That his rewards were small cannot affect the intent with which the work was done. Plaintiff cannot seriously contend that the result should depend on the success or the relative lack thereof enjoyed in the plaintiff's business. The plaintiff's intent alone controls.

For the reasons above set forth, we hold as matter of law that plaintiff totally failed to prove himself within the terms of the defendant's policy, and that the trial court erred in refusing to direct a verdict for the

defendant, and in refusing to grant judgment for the defendant notwithstanding the verdict. It is therefore unnecessary to consider the other points relied upon by the defendant for reversal. The judgment of the circuit court of Adams county is reversed and the cause remanded with directions to enter judgment for the defendant.

*Reversed and remanded with directions.*